# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MUSTAFA RAOOF,** *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> **JOHN J. SULLIVAN, ACTING SECRETARY OF STATE,**[1] *et al.* <br><br> Defendants. | Case No. 1:17-cv-01156-TNM |

## MEMORANDUM OPINION

Under the J-1 visa program, foreign doctors, accompanied by their spouse and minor children, can "temporarily" visit the United States for "graduate medical education or training." 8 U.S.C. § 1101(a)(15)(J). Exchange visitors in this category cannot apply for permanent residence unless they return to their last foreign residence for two years—barring a waiver of the requirement from the Attorney General, with the approval of the State Department and the Department of Homeland Security (DHS) (collectively, the Government). 18 U.S.C. § 1182(e). In this case, Dr. Mustafa Raoof, his wife Sidra Haye, and their American son challenge the denial of Dr. Raoof's waiver request, which requires them to return to Pakistan. The Government moves to dismiss, contending in large part that the decision is entrusted solely to agency discretion, and not reviewable by the judicial branch. For the reasons that follow, I will grant the motion to dismiss.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Acting Secretary of State has been substituted for Rex W. Tillerson, his predecessor.

1

# I. Background

Dr. Raoof and his wife, Ms. Haye, are citizens of Pakistan, and current residents of California. Compl. ¶¶ 1-2. Dr. Raoof entered the country in 2009 on a form of the J-1 visa, "as a nonimmigrant exchange visitor under 8 U.S.C. § 1101(a)(15)(J) to undertake a residency program in general surgery." *Id*. at ¶ 24. His visa was sponsored by the Educational Commission for Foreign Medical Graduates (ECFMG). *Id*. at ¶ 25. After Dr. Raoof wed Ms. Haye in April 2010, she entered the country in July 2010 on a J-2 visa, *id*. at ¶¶ 24, 27, "as a derivative" of Dr. Raoof's status. *Id*. at ¶ 21. Their son, "M.R.," was born in the United States in September 2015, making him an American citizen by birth. *Id*. at ¶ 28. Because Dr. Raoof came to the United States for graduate medical education, he is subject to the "two-year foreign residency requirement" under 18 U.S.C. § 1182(e), and cannot apply for permanent resident status, better known as a Green Card, "until he has either fulfilled the requirement by spending two years in his home country, or until he has obtained a waiver of the requirement." *Id*. at ¶ 18.

Dr. Raoof applied for a waiver of the two-year foreign residency requirement in 2016, arguing that his U.S. citizen son would be subjected to "exceptional hardship" if forced to return to Pakistan. *Id*. at ¶¶ 22, 36-41. According to the complaint, "Pakistan is one of the most violent, dangerous, and unstable countries in the world," with ongoing sectarian and political violence. *Id*. at ¶ 14. Both Dr. Raoof and his wife are from "the large southern port city of Karachi," which they allege "is in a state of near-anarchy, with constant gang wars and sectarian violence," creating an "exceptional risk" that their son would be "singled out for mistreatment and/or kidnapping for ransom" because of his American citizenship. *Id*. at ¶ 15. A forced return to Pakistan would also allegedly cause M.R. exceptional medical, psychological, educational, and sociocultural hardships. *Id*. at ¶ 16.

On December 1, 2016, United States Citizenship and Immigration Services (USCIS), a component of DHS, allegedly made the initial determination—via Defendant Kathy Baran, Director of the USCIS California Service Center—"that Dr. Raoof's qualifying relative would suffer exceptional hardships if a waiver was not granted." *Id*. at ¶ 44; *see also* Def.'s Mot. Dismiss 3 (Mot. Dismiss) (declining to deny the allegation). This finding was memorialized on a "Form I-613," which indicated that "prior to Ms. Baran's review . . . an Adjudications Officer and a Supervisory Officer all made the same finding." *Id*. at ¶ 44. Dr. Raoof's waiver application was then sent to the State Department's Waiver Review Division (WRD). *Id*. at ¶ 50.[2]

Because USCIS had already determined that non-waiver would impose an exceptional hardship, WRD was required to "review the program, policy, and foreign relations aspects of the case, make a recommendation, and forward it to the appropriate office at DHS (in this case, the USCIS California Service Center)." 22 C.F.R. § 41.63. That same regulation states that "If it deems it appropriate, the Waiver Review Division may request the views of each of the exchange visitors' sponsors concerning the waiver application." *Id*. After receiving the application, WRD obtained "a Letter of Need," a document required by regulation for "admission to the United States in J-1 status for graduate medical education," likely written by ECFMG, Dr. Raoof's original sponsor. Compl. ¶ 52. The Plaintiffs allege "[o]n information and belief" that the WRD "did not seek or review Letters of Need" in cases like Dr. Raoof's prior to 2010. *Id*. at ¶ 54. WRD then "issued a Not Favorable recommendation" using the bottom of Form I-613, and sent

---

[2] The complaint alleges that "without discovery, it is impossible to know" whether a complete copy of the initial hardship determination and a summary of the details of the expected hardship were transmitted to WRD, as required by State Department regulations. *Id*. at ¶ 45-50.

the recommendation back to Director Baran at the USCIS California Service Center. *Id*. at ¶ 56. Although the form "contains a box that allows the State Department to explain" the reasons for its recommendation, WRD did not use this box. *Id*. at ¶¶ 55, 57.

Director Baran then denied the waiver application on the basis of the State Department's recommendation, explaining that:

> In reaching this conclusion, the Waiver Review Division considered a range of facts relevant to assessing program, policy, and foreign relations interests in your case and determined that you would provide valuable knowledge, skills and expertise as a physician in the field of general surgical oncology. If you fail to fulfill your two-year foreign residency requirement, Pakistan would lose the opportunity to gain from your valuable experience in the United States.

*Id*. at ¶¶ 73-74. There is no administrative appeal from this decision. *Id*. at ¶ 75. Because Ms. Haye's J-2 status is derivative of Dr. Raoof's, agency regulations state that she is subject to the same two-year foreign residency requirement. 22 C.F.R. § 41.62(c)(4); 8 C.F.R. § 212.7(c)(4); Compl. ¶¶ 82, 85-85. The Plaintiffs argue that this requirement is "contrary to the plain language of 8 U.S.C. § 1182(e)," which they claim only applies to the original J-1 visa recipient. Compl. ¶¶ 81-82, 87.

This suit contains nine counts challenging the waiver denial on statutory interpretation grounds, and under the Administrative Procedure Act (APA), the Constitution's Due Process Clause, the International Covenant on Civil and Political Rights, the Mandamus Act, and the Declaratory Judgment Act. Compl. 21-30. The Government has moved to dismiss, citing lack of jurisdiction as to the APA abuse of discretion count, and failure to state a claim as to the remainder. Mot. Dismiss 1-2.

## II. Legal Standards

Under Federal Rule of Civil Procedure 12(b)(1), a complaint may be dismissed for lack of subject matter jurisdiction, if the plaintiff fails to establish it. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "While the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction . . . the court must still accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks and citations omitted).

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). In this inquiry, a court must "draw all reasonable inferences from those allegations in the plaintiff's favor," but does not "assume the truth of legal conclusions." *Id*.

## III. Analysis

The Plaintiffs' "chief claim" is that "is that the State Department must have abused its discretion" in denying Dr. Raoof's waiver application. Compl. ¶ 16. Although they press this contention in many legal forms, and assail related aspects of the waiver determination system, each claim ultimately fails. The challenged decision, while important and complicated, is

fundamentally discretionary. The power to make it has been allotted by statute to designated executive branch officials. On the facts presented, the judicial branch is not authorized to intervene or second guess that decision.

**A. The APA Does Not Provide Jurisdiction to Review Discretionary Waiver Denials**

In Count One, the Plaintiffs claim that the denial of Dr. Raoof's waiver application violates the APA. *Id.* at ¶ 106. They assert that the Government "failed to consider all the evidence in the record," and that "there is no evidence that the Defendants reviewed the program, policy, and foreign relations aspects of this case." *Id.* at ¶¶ 102-3. On this basis, the Plaintiffs argue that the denial was "contrary to [] statutory standards, the regulations, the legislative history, and the intent of Congress," "arbitrary and capricious," "and otherwise constitutes an abuse of discretion." *Id.* at ¶¶ 102, 106. However, the APA does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An agency action is "committed to agency discretion" when "statutes are drawn in such broad terms that in a given case there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), meaning that "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Applying this standard, the D.C. Circuit has already concluded that the decision to grant or deny a Section 1182(e) waiver application is wholly committed to agency discretion, and therefore unreviewable under the APA. In *Slyper v. Attorney Gen.*, two foreign doctors who had married American citizens challenged the denial of their waiver applications, arguing that the decision was "arbitrary, unreasonable, and an abuse of discretion." 827 F.2d 821, 822 (D.C. Cir. 1987). *Slyper* first reviewed the statute, which allows the Attorney General to grant a waiver

> upon the favorable recommendation of the Director, pursuant to
> the request . . . of the Commissioner of Immigration and

6

> Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien)[.]

8 U.S.C. § 1182(e). *Slyper* then explained that applicable regulations "repeat practically verbatim the waiver procedure in the statute . . . and provide the most general type of guidance for [agency] action"—to "review the policy, program, and foreign relations aspects of the case and [] transmit a recommendation to the Attorney General for decision." *Slyper*, 827 F.2d at 823 (quoting 22 C.F.R. § 514.32 (1986)); *see also* 22 C.F.R. § 41.63 (2007) ("the Waiver Review Division shall review the program, policy, and foreign relations aspects of the case, make a recommendation, and forward it to the appropriate office at DHS.").

*Slyper* found that "[i]t is clear from the face of the statute that Congress intended to vest maximum discretion in the Director to oppose waivers requested by visiting physicians. The statute contains no standard or criterion upon which the Director is to base a decision to make or withhold a favorable recommendation." *Slyper*, 827 F.2d at 823. In contrast to another immigration case involving a decision for which "the statute lists thirty-three distinctly delineated categories that conspicuously provide standards to guide the Executive," *id*. at 824 (citing *Abourezk v. Reagan*, 785 F.2d 1043, 1051 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987)), *Slyper* reasoned that "the governing statute [here] is devoid of guidance. Insofar as the Director is subject to any direction, it is to be found in the [] regulation requiring that he review waiver applications in light of unspecified 'policy, program, and foreign relations aspects of the case.'" *Id*. (quoting 22 C.F.R. § 514.32 (1986)). Without a standard to apply, Congress could not have intended judicial review under the APA—although *Slyper* quickly added that this conclusion did not mean that these decisions are "never subject to review." *Id*. at 824. The court suggested that jurisdiction might lie if "a colorable claim were made of constitutional, statutory, or regulatory

7

violation, or of fraud or lack of [agency] jurisdiction." *Id*. Because the plaintiffs' only claim was that the Government abused its discretion in violation of the APA, review was impossible. *Id*. Lacking a "meaningful standard against which to judge the agency's exercise of discretion," *Heckler*, 470 U.S. at 830, *Slyper* affirmed the dismissal of the plaintiffs' APA claims for lack of subject matter jurisdiction.

*Slyper* is binding authority in this District. The Plaintiffs try to avoid this conclusion by pointing to the decision's alleged failure to conduct "any review of the legislative history." Opp. 2. But even if I disagreed with the D.C. Circuit's analysis, I am not free to depart from its judgments. For that reason, the Plaintiffs' reliance on a contrary decision from the Third Circuit, *Chong v. Dir., U.S. Info. Agency*, 821 F.2d 171, 176 (3d Cir. 1987), and their claim that other circuit decisions suggest another result, Opp. 2-6, are unavailing. In fact, the D.C. Circuit indicated in *Slyper* that it was aware of the Second and Ninth Circuits' consonant decisions, and the Third Circuit's disagreement. *Slyper*, 827 F.2d at 824 (citing cases). To the extent that Counts Two through Eight attempt to establish jurisdiction with "a colorable claim . . . of constitutional, statutory, or regulatory violation, or of fraud or lack of [agency] jurisdiction," *id*., I will address those claims on their own merits in the forthcoming analysis. *See* Opp. 2 (citing Counts One through Nine). But Count One is titled "Abuse of Discretion and Violation of the [APA]," and it challenges the substantive decision to deny Dr. Raoof's waiver petition as an abuse of discretion under the APA. Compl. 21-22. With *Slyper* as binding precedent, Count One must be denied for lack of subject matter jurisdiction.[3]

---

[3] Under the header of Count I, the Plaintiffs also allege that "the Defendants routinely fail to provide any valid explanation for their recommendations" and that "the State Department intentionally does not provide the basis for its decisions in J-1 waiver cases so that it can evade judicial review." Compl. ¶¶ 103-4. But the APA only allows challenges to "a *discrete* agency action," not "broad programmatic attack[s]" like these. *Norton v. S. Utah Wilderness All.*, 542

## B. The Foreign Residence Requirement Also Applies to Derivative Visa-Holders

In Count Two, the Plaintiffs challenge the application of the two-year foreign residence requirement to Ms. Haye, contending that the agency regulations enforcing this rule are "inconsistent with the plain language of [the statute]," and were promulgated without following the APA's required rule-making procedures. Compl. 22-23; *see also* 22 C.F.R. § 41.62(c)(4) (applying the requirement to J-2 derivative beneficiaries); 8 C.F.R. § 212.7(c)(4) (same). I conclude that it is in fact the Plaintiffs' legal interpretation that is inconsistent with the statutory scheme.

When read in isolation, the statute creating the foreign residence requirement seems to apply only to the original J-1 visa holder:

> No person admitted under section 1101(a)(15)(J) of this title . . . who came to the United States or acquired such status in order to receive graduate medical education or training, shall be eligible to apply for an immigrant visa, or for permanent residence, or for a nonimmigrant visa . . . until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least two years following departure from the United States[.]

8 U.S.C. § 1182(e). Ms. Haye did not personally come to the United States "in order to receive graduate medical education or training," as all parties agree. *See id.*; Opp. 16-17. But Section 1182(e) is only one piece of the puzzle. In answering statutory interpretation questions, "[a] court must . . . interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if

---

U.S. 55, 64 (2004) (emphasis original); *see also* 5 U.S.C. § 706 ("Scope of review").

The Plaintiffs also make a fleeting suggestion that the State Department should not "seek or review Letters of Need" in cases like this. Compl. ¶ 54. But agency regulations specifically allow the practice. 22 C.F.R. § 41.63 ("If it deems it appropriate, the Waiver Review Division may request the views of each of the exchange visitors' sponsors concerning the waiver application."). Even without that authorization, *Slyper* would still forbid judicial review under the APA, since the waiver decision is wholly committed to agency discretion.

possible, all parts into a[] harmonious whole.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted). Reading the statute in this manner leads inexorably to the conclusion that derivative beneficiaries are subject to the same requirements as the primary visa holder.

Ms. Haye was admitted under the same statutory provision as Dr. Raoof, as an "alien spouse . . . accompanying [Dr. Raoof] or following to join him." 8 U.S.C. § 1101(a)(15)(J). That provision defines a "nonimmigrant alien[]," 8 U.S.C. § 1101(a)(15), as:

> an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill . . . who is coming temporarily to the United States as a participant in a program . . . for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 1182(j) of this title, *and the alien spouse and minor children of any such alien if accompanying him or following to join him*[.]

8 U.S.C. § 1101(a)(15)(J) (emphasis added). The statute's language is instructive. Dr. Raoof has come "temporarily" to the United States, and his eligibility for the program hinges on whether he has "no intention of abandoning" his "residence in a foreign country." *Id*. Ms. Haye's status is derivative of Dr. Raoof's, as his "alien spouse." *Id*. Not only that, but Ms. Haye can obtain a J-2 visa only "if accompanying him or following to join him." *Id*. Because Dr. Raoof has met these requirements, and Ms. Haye is his spouse, she qualifies as a "nonimmigrant alien." *Id*.

Armed with these insights, we have all we need to complete the puzzle. Since Ms. Haye derives her status wholly from Dr. Raoof's status, it would be inconsistent with the statute (and

10

the rules of logic) for her to somehow obtain from Dr. Raoof an immigration benefit that he himself did not and could not possess. All of the statutory clues confirm this deduction. Read as a whole, the exchange visitor program preserves family unity by allowing J-2 visa holders to remain with J-1 visa holders as they "temporarily" travel to the United States, and return to practice medicine in their country of origin with fresh abilities. When section 1182(e) tells us that anyone "admitted under section 1101(a)(15)(J) of this title . . . who came to the United States or acquired such status in order to receive graduate medical education or training" must return to their last foreign residence before applying for a Green Card, the most natural reading of the statute is that derivative visa holders—"nonimmigrant[s]," the statute reminds us—must do the same, because their continued residence in the United States is tied to the J-1 person's status. The opposite conclusion would be inconsistent with the entire scheme of the J-1 visa program, and fails to state a plausible claim.[4]

The Plaintiffs also claim that the two regulations implementing this rule violate the APA, 5 U.S.C. § 553, because the agencies "did not engage in formal rule-making." Compl. ¶¶ 108-9. But the agencies were not required to do so. The rule making section of the APA does not apply when the rule "involve[s] . . . a military or foreign affairs function of the United States," 5 U.S.C. § 553(a), and the notice and comment requirements do not apply to "rules of agency organization, procedure, or practice." *Id*. at § 553(b)(A). When the State Department announced that "[i]f an alien is subject to the 2–year foreign residence requirement . . . the spouse or child of that alien, accompanying or following to join the alien, is also subject to that requirement," 22

---

[4] Even if the statutory text was silent or ambiguous on this question, which it is not, *Chevron* deference would require me to uphold the agencies' reasonable interpretation of the statutory scheme. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Not only is the agencies' interpretation "permissible," *id*., but any other interpretation would conflict with the Congressional scheme for the reasons just explained.

11

C.F.R. § 41.62(c)(4), it explicitly invoked the exemption for foreign affairs. 37 Fed. Reg. 17471 ("The provisions of the Administrative Procedure Act . . . relative to notice of proposed rule making are inapplicable to this order because the regulations . . . involve foreign affairs functions of the United States."). The Plaintiffs object that the State Department had no authority to promulgate this regulation, since it is largely DHS that is "charged with the administration and enforcement of [the Immigration and Nationality Act]." Opp. 23 (quoting 8 U.S.C. § 1103). But DHS' authority over the INA, and immigration and naturalization laws generally, extends "except insofar as . . . such laws relate to the powers, functions, and duties conferred upon . . . the Secretary of State, [and] the officers of the Department of State," among others. 8 U.S.C. § 1103(a)(1). The exchange visitor program—with its statutory mandate for international interaction through nonimmigrants—certainly relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department. More immediately, the very waiver at issue in this case requires the approval of the State Department, as even the Plaintiffs admit. Opp. 22 (citing 8 U.S.C § 1182(e)). I conclude that the APA's rule-making requirements do not apply to 22 C.F.R. § 41.62(c)(4), and that the State Department properly exercised its authority to promulgate the regulation and invoke the foreign affairs exception.

Similarly, USCIS did not need to follow the APA's rule making procedures when it adopted a conforming regulation. *See* 37 Fed. Register at 22725-22726 (adopting 8 C.F.R. § 212.7(c)(4) in order "to conform to the Department of State regulations published August 29, 1972 (37 [Fed. Reg.] 17470)"). Adopting the same rule simply made "agency . . . procedure[] or practice" consistent across agencies, and thus did not require notice and comment. *See* 5 U.S.C. § 553(b)(A). Even if the rule had any substantive effect, those effects involved the same foreign

policy considerations as the State Department's original rule, and the APA would be just as inapplicable. *Id.* at § 553(a).

In sum, the Plaintiffs have not plausibly raised a statutory or APA challenge to applying the foreign residence requirement to derivative J-2 visa holders like Ms. Haye. Count Two therefore fails to state a claim upon which relief can be granted.

### C. The Plaintiffs Have Not Alleged a Protected Due Process Right

The Plaintiffs also challenge the denial of Dr. Raoof's waiver request under the Due Process Clause, in Counts Three, Four, and Five. The manner of the denial, they allege, violated their rights to life, family unity, and property. Compl. 23-24. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). But "[t]he initial inquiry" in a Due Process claim is determining whether a protected life, liberty or property interest has been implicated. *Meachum v. Fano*, 427 U.S. 215, 223 (1976). "[T]he range of interests protected by procedural due process is not infinite." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (1972).

The Plaintiffs cite to no authority identifying a protected interest in this context. They attempt to rely on *Goldberg v. Kelly,* 397 U.S. 254 (1970), which "held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." *Roth*, 408 U.S. at 576; Opp. 25-26. Based on this holding, the Plaintiffs contend that they have "a property interest in the application fees paid to the State Department and the USCIS." Opp. 25. But *Goldberg* was concerned with "the *termination* of benefits," 397 U.S. at 260 (emphasis added), while the Plaintiffs are concerned with obtaining a waiver they do not possess. As the

13

Supreme Court later explained, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth*, 408 U.S. at 576. "To have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it." *Id.* at 577. As the Government puts it, all the rights that the Plaintiffs invoke apply only if they have a right to waiver in the first instance. Mot. Dismiss 33.[5] "[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." *Olim v. Wakinekona*, 461 U.S. 238, 251 n.12 (1983); *see also Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) ("Where . . . the legislature leaves final determination of which eligible individuals receive benefits to the 'unfettered discretion' of administrators, no constitutionally protected property interest exists.").[6] As I explained in Section III A, the D.C. Circuit has already held that the agencies' waiver decision is unreviewable, because both the statute and "the regulation [are] equally devoid of meaningful direction," *Slyper*, 827 F.2d at 824, and thus "committed to agency discretion by law." *Id.* (quoting 5 U.S.C. § 701(a)(2)). With no rights at issue to which the Plaintiffs can lay claim, their Due Process claims cannot survive the motion to dismiss.

### D. The Remaining Counts Fail to State a Claim

The Plaintiffs' remaining four claims can be quickly dispatched.

---

[5] The Plaintiffs contend that "[Government] do[es] not make arguments for dismissal of Count Three [right to life] and Four [right to family unity]." Opp. 27 n. 25. Not so. The Government argues repeatedly that the Plaintiffs have not shown a "liberty or property interest" in this case, and conclude with the claim that "Plaintiffs' due process *claims* therefore fail." Mot. Dismiss 33-34 (emphasis added).

[6] Since the Plaintiffs relinquished all entitlement to their application fees upon payment, retaining only an "expectation of receiving process" in return, they have retained no constitutionally protected interest in those funds.

In Count Six, they assert that "a more relaxed standard should be taken in determining whether a waiver should be granted in a case like Dr. Raoof's," relying on legislative history for this proposition. Compl. ¶126; Opp. 24 (disputing the Government's "mischaracterization of the Plaintiffs' reliance" on two Board of Immigration Appeals cases, because "Plaintiff cited these cases to show that the State Department and the INS recognized and relied on the suggestion made by Congress in the legislative history."). But "[j]udicial investigation of legislative history has a tendency to become . . . an exercise in 'looking over a crowd and picking out your friends.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). I am required to apply the statute as passed by Congress and signed by the President, not some legislator's gloss about what the statute should accomplish. The governing "statute contains no standard or criterion upon which the Director is to base a decision." *Slyper*, 827 F.2d at 823; *see also* 8 U.S.C. § 1182(e). "The [] regulations repeat practically verbatim the waiver procedure in the statute, and provide the most general type of guidance," *Slyper*, 827 F.2d at 823, saying only that "the Waiver Review Division shall review the program, policy, and foreign relations aspects of the case." 22 C.F.R. § 41.63 (2007). The Government explicitly applied this language in denying Dr. Raoof's waiver request. *See* Compl. ¶ 74. The law requires no 'relaxed' standard beyond the one applied.

The Plaintiffs' next claim, in Count Seven, is that the Government failed to "supply a reasoned analysis" for a "change in policy and standards." *Id.* at ¶¶ 130, 132. They point to their law firm's record in J-1 exceptional hardship cases, and the increase in "Not Favorable" recommendations they received in the first quarter of 2017. *Id* at ¶ 131. The Plaintiffs cite *Greater Boston Television Corp. v. F.C.C.*, which relied on "the Rule of Law, as established by Administrative Law doctrine" for the proposition that "an agency changing its course must

15

supply a reasoned analysis indicating that prior policies and standards are being deliberately changed." 444 F.2d 841, 852 (D.C. Cir. 1970). But the Plaintiffs offer no evidence for this alleged "change in policy" beyond mere "Not Favorable" recommendations, Compl. ¶ 131, and nowhere indicate what the new policy might be. That is not enough factual content from which a factfinder could "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.[7] Even if the Complaint *did* offer enough allegations from which I could infer a new, unexplained policy, it would not matter. The State Department's waiver decision is fundamentally discretionary, and it is explicitly authorized to consider the "program, policy, and foreign relations aspects of the case." 22 C.F.R. § 41.63. The Government applied that standard in Dr. Raoof's case, Compl. ¶ 74, and the Plaintiffs lack standing to challenge injuries to anyone else.

Invoking the International Covenant on Civil and Political Rights (ICCPR), the Plaintiffs assert in Count Eight that "denying Dr. Raoof's [] waiver application without any rational basis violates . . . various articles of the [ICCPR]," including "Articles 1,12, 17, 18, 23, and 24, in addition to possible violations of other articles." Compl. ¶ 137. But "[c]ourts have uniformly held that the ICCPR is not self-executing and that, therefore, it does not give rise to a private right of action." *Macharia v. United States*, 238 F. Supp. 2d 13, 29 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (D.C. Cir. 2003). Without a private right of action, the Plaintiffs' "claim based on the ICCPR must be dismissed for failure to state a claim and for lack of jurisdiction." *Id*. The

---

[7] The Plaintiffs protest that their attorneys' experience in submitting "647 waiver applications" undergirded the complaint's assertions, and that "[i]t would be impossible to prove this [change in policy] averment without discovery." Opp. 15-16. But the Supreme Court has made clear that the plaintiff carries the initial burden of pleading enough facts to state a plausible claim. *Iqbal*, 556 U.S. at 678. With no evidence pointing to a specific preexisting or new "policy" beyond the State Department's authority to consider the "program, policy, and foreign relations aspects of the case," 22 C.F.R. § 41.63, the Plaintiffs have failed to make a plausible claim.

Plaintiffs do not seem to dispute this proposition generally, but contend only that their "application for a writ of mandamus is not equivalent to a private right of action." Opp. 31-32. But the Plaintiffs have also failed to state a mandamus claim, because "[t]he extraordinary remedy of mandamus under 28 U.S.C. § 1361 will issue only to compel the performance of 'a clear nondiscretionary duty.'" *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) (quoting *Heckler*, 466 U.S. at 616). There is no "clear nondiscretionary duty" for me to enforce in this case, because the decision at issue has been "committed to agency discretion by law." *Slyper*, 827 F.2d at 824.

In their final claim, the Plaintiffs seek relief under the Declaratory Judgment Act, 28 U.S.C. § 2201-2. Compl. 27-30. This claim merely reasserts the first eight counts, and asks me to "declare" the Government's legal obligations under each one. *Id.* Asking for declaratory relief rather than some other remedy cannot save these claims from a lack of jurisdiction (Count One) or failure to state a claim (the remainder). For all the reasons that those claims fail, Count Nine also fails to state a claim upon which relief can be granted.

## IV. Conclusion

For these reasons, the Government's motion to dismiss will be granted. A separate order will issue.

Dated: April 10, 2018

TREVOR N. MCFADDEN
United States District Judge